# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

**ADRIAN F. KING, JR.,**

      Plaintiff,

**v.**

                                            **CIVIL ACTION NO.: 3:14-CV-42**
                                            **(JUDGE GROH)**

**JIM RUBENSTEIN, Commissioner,**
**MARVIN C. PLUMLEY, Warden,**
**DIANNE R. MILLER, Assoc. Warden Programs/Housing,**
**GROVER ROSENCRANCE, Deputy Warden,**
**LESTER THOMPSON, Unit Manager E-1 Segregation,**
**SHERRI DAVIS, Unit Manager E-2 Segregation,**
**STACY SCOTT, Supervised Psychologist/Ad Seg Board,**
**MIKE SMITH, SR., Unit Manager Ad Seg Board,**
**SAMANTHA GSELL, Case Manager, Ad Seg Board,**
**ADAM SMITH, Ad Seg Board Chairman, and**
**CLIFF GOODIN, Head Psychologist,**

      Defendants.

## MEMORANDUM OPINION AND ORDER REJECTING IN PART REPORT AND RECOMMENDATION AND GRANTING MOTION TO DISMISS

      The Court now considers the Report and Recommendation ("R&R") of United States Magistrate Judge John S. Kaull. By standing order, the Court referred the matter to Magistrate Judge Kaull for submission of a proposed R&R. The R&R recommends that this Court grant the Defendants' Motion to Dismiss [ECF 2] in part.

### I. Background[1]

      Adrian F. King, Jr. is an inmate at Huttonsville Correctional Center ("HCC"). King

---

[1] This section assumes the facts alleged in the complaint are true and construes those facts in the light most favorable to King, even though the Defendants deny facts King alleges.

chose to have marbles implanted in his penis in November 2008. King was later incarcerated. In January 2013, a correctional officer directed King to the medical unit because another inmate reported King had marbles in his penis. A nurse examined King and confirmed the presence of marbles. King told the nurse the marbles were implanted before his incarceration. An officer told King that the implants were not noted in his file. King responded that, during processing, he had informed an officer that he had the implants. Officials found King in violation of policy directive 325.00 - 1.26, which prohibits exposing body fluids/tattooing/piercing. Due to the contraband marbles, King was placed in segregation and lost privileges and good time. King does not contest the marbles were contraband. The segregation lasted until the marbles were surgically removed.

During King's segregation, King alleges Sherri Davis made him sign a document but did not let him read it. King alleges Davis told him that the document was a form consenting to have a doctor at Ruby Memorial Medical Center examine the implants and remove them if necessary.

On January 31, 2013, a doctor examined King at Ruby Memorial. The doctor confirmed the marbles were not recently implanted and found no medical need to remove them. The doctor would not remove the marbles without King's consent. King returned to HCC that same day. According to King, upon his return, Deputy Warden Grover Rosencrance told King, "Get comfortable you stupid Son of a Bitch, you'll be placed in Administrative Segregation until you do as I say and have those marbles removed." King returned to administrative segregation. King alleges HCC officials threatened him with

segregation for the remainder of his sentence, loss of parole eligibility and physical violence unless he consented to have the implants surgically removed.

On June 19, 2013, King consented to the surgery, allegedly due to the threats of continued segregation and other adverse actions.  According to King, the surgery caused him mental anguish and pain and suffering, including pain and tingling in his penis, "an uncomfortable, stretching feeling where the cut was made," "a stabbing pain that shoots into [his] stomach" when the scar on his penis is touched or he bumps into something, and pain in his penis when it is rainy, snowy or cold.

Following the surgery, King filed this action under 42 U.S.C. § 1983 in the Circuit Court of Kanawha County, West Virginia.  His complaint names Jim Rubenstein (Commissioner), Warden Plumley, Dianne R. Miller (Assoc. Warden Programs/Housing), Deputy Warden Rosencrance, Lester Thompson (Unit Manager E-1 Segregation), Sherri Davis, Stacy Scott (Supervised Psychologist/Ad Seg Board), Mike Smith, Sr. (Unit Manager Ad Seg Board), Samantha Gsell (Case Manager Ad Seg Board), Adam Smith (Unit Manager Ad Seg Board Chairman) and Cliff Goodin (Head Psychologist) as defendants.  King claims that the surgery violated the Eighth Amendment's protection against cruel and unusual punishment, the Fourteenth Amendment's right to equal protection, and the Fourth Amendment's right to be free from illegal searches and seizures.[2]

---

[2] Neither party objects to the R&R's characterization of the Plaintiff's claims. As such, the Court reviews that portion of the R&R for clear error and finds none.

In addition, as the Court must construe the pleadings in the light most favorable to King, the Court considers the two documents filed by King to initiate this case, a civil rights complaint and motion for initial

In support of his equal protection claim, King asserts that officials do not bother other inmates with penile implants and other modifications. He specifies two cases where this occurred. The first inmate was placed in a suicide cell for implanting plastic in his penis but was released into general population and was not held in segregation for an extended period. Second, an inmate was convicted of implanting domino pieces in his and another inmate's penis. Both inmates refused to remove the pieces and were released into general population.

On April 11, 2014, the Defendants removed this case to the Southern District of West Virginia and moved to dismiss it under Federal Rule of Civil Procedure 12(b)(6). United States Magistrate Judge Dwane L. Tinsley thereafter transferred the case to the Northern District of West Virginia. On December 11, 2014, Magistrate Judge Kaull entered his R&R concerning the Motion to Dismiss. Each party then filed objections to the R&R. The Defendants responded to King's objections. King did not respond to the Defendants' objections.

## II.  Standards of Review

### A.  R&R

Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court must make a *de novo* review of those portions of the magistrate judge's findings to which any party objects. However, the Court need not review those portions of the findings or recommendation to which no party objects. Thomas v. Arn, 474 U.S. 140, 150 (1985). Failure to timely file objections

---

review of complaint, as constituting King's complaint.

constitutes a waiver of *de novo* review and the right to appeal this Court's order. 28 U.S.C. § 636(b)(1); <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Because both parties timely filed objections, the Court will review *de novo* those portions of the magistrate judge's findings to which a party objects and the remainder of the R&R for clear error.[3]

### B.    Rule 12(b)(6) Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). To survive a Rule 12(b)(6) motion, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A complaint need not contain "'detailed factual allegations,'" but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 555). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice

---

[3]    The Defendants argue that King's objections are untimely. Objections were due within fourteen days of being served with the R&R. Because King was served by mail, three days are added to the response period, giving him seventeen days to respond after service. Fed. R. Civ. P. 6(d). King received the R&R on December 15, 2014. His objections therefore were due seventeen days later on Thursday, January 1, 2015. Because January 1 was a legal holiday and the clerk's office was closed on January 2, 2015, the objections period ran to the following Monday, January 5, 2015. Fed. R. Civ. P. 6(a)(1)(C), (3)(A). King delivered his objections for mailing before this deadline on December 30, 2015. Thus, King's objections are timely.

if it tenders 'naked assertions' devoid of 'further factual enhancements.'"  Id.  (quoting Twombly, 550 U.S. at 555, 557).  Twombly's plausibility standard applies to *pro se* complaints, Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008), but a court must construe such complaints liberally.  Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985).

Additionally, when reviewing a Rule 12(b)(6) motion, a court must assume that the complaint's well-pleaded allegations are true, resolve all doubts and inferences in favor of the plaintiff, and view the allegations in a light most favorable to the plaintiff.  Edwards v. City of Goldsboro, 178 F.3d 231, 243-44 (4th Cir. 1999).  Only factual allegations receive the presumption of truth.  Iqbal, 556 U.S. at 678-79.  A court may also consider facts derived from sources beyond the complaint, including documents attached to the complaint, documents attached to the motion to dismiss "so long as they are integral to the complaint and authentic," and facts subject to judicial notice under Federal Rule of Evidence 201.  Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

### III.  Discussion

Magistrate Judge Kaull recommends: (1) dismissing Stacy Scott without prejudice for failure to effect service; (2) dismissing Jim Rubenstein, Cliff Goodin, and Marvin C. Plumley with prejudice for failure to plead a basis for holding them liable under § 1983; (3) dismissing the Eighth Amendment claim; (4) denying the motion to dismiss the Fourteenth Amendment claim; and (5) denying the motion to dismiss the Fourth Amendment claim.

## A.    Dismissal of Stacy Scott

Neither party objects to the recommendation that the Court dismiss Stacy Scott. Accordingly, the Court reviews this recommendation for clear error and finds none.    The Court therefore dismisses Stacy Scott without prejudice for failure to effect service.

## B.    Dismissal of Jim Rubenstein, Cliff Goodin, and Marvin C. Plumley

Magistrate Judge Kaull recommends dismissing Rubenstein, Goodin, and Plumley because King failed to state a claim against them in their personal, official or supervisory capacity.    King objects to this recommendation.

A state official could face liability in a § 1983 suit in three ways.    See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).    First, a plaintiff can establish that an official is liable in his personal capacity.    Id. at 166.    To do so, he must "affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights."    Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).    In short, this requires proof that the official "had personal knowledge of and involvement in the alleged deprivation."    Id.

Second, a state official can be sued in his official capacity for prospective injunctive relief.    Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989).    "More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law."    Graham, 473 U.S. at 166 (internal quotation marks and citations omitted).

Third, although respondeat superior liability is not available in § 1983 claims, see Monell v. Dep't of Social Servs., 436 U.S. 658, 691-95 (1978), a supervisor may be liable

7

for a subordinate's acts done pursuant to an official policy or custom.  Fisher v. Wash.

Metro. Area Transit Auth., 690 F.2d 1113, 1142-43 (4th Cir. 1982).  A supervisor is so

liable if the plaintiff establishes:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

First, King argues Rubenstein and Goodin should not be dismissed as follows:

> Defendant Rubenstein is Commissioner of Corrections, and is responsible for the proper training and behavior of employees under him.  He is also responsible for the safety and treatment of the prisoners under his care and custody.  Therefore, Defendant Rubenstein either has or should have full knowledge of everything that, such as the Plaintiff's treatment, and should not be freed from blame in this case.
>
> . . .
>
> Defendant Goodin is the Lead Psychologist at HCC and is well aware of the adverse effects that deprivation caused by "PROLONGED" periods of segregation has on an individual . . . .  Defendant Goodin did absolutely nothing to aid the Plaintiff and did not meet with him to check on his mental health condition and possible deterioration of psychological/mental stability. Therefore, Defendant Goodin should not be relieved of responsibility for his unprofessional/unethical/immoral behavior in this matter.

Despite King's argument in his objections, the actual complaint does not even

mention Rubenstein or Goodin outside of the caption.  Thus, with no allegations that

Rubenstein or Goodin acted personally in the alleged deprivation of King's rights, the

complaint fails in this regard.  See Wright, 766 F.2d at 850.  The same is true for official

capacity liability. The complaint makes no allegations that Rubenstein or Goodin enacted or oversaw an official policy or custom at issue. As for supervisory liability, the complaint does not allege that Goodin supervised anyone whose actions are at issue or knew or should have known of the alleged events. See Shaw, 13 F.3d at 799. King argues Rubenstein oversees training of HCC staff. But the mere fact that Rubenstein serves as a supervisor does not subject him to supervisory liability; the elements of supervisory liability must be met. See id. The complaint neither alleges that Rubenstein knew or should have known of the alleged events, nor asserts any plausible basis for charging him with constructive or actual knowledge that HCC officials engaged in conduct that could violate King's constitutional rights. See id. Accordingly, the Court overrules this objection because the complaint does not plead a plausible basis for holding Rubenstein and Goodin liable under § 1983.

Next, King's complaint seeks to hold Plumley liable in his personal capacity, alleging Plumley "directly participated in the violation of" his rights by overturning the administrative segregation committee's decision to release him from segregation and ordering him to remain there until he agreed to the surgery. King does not contend that Plumley is liable in his official or supervisory capacity. Thus, the Court reviews that portion of the R&R for clear error and finds none.

Considering personal capacity liability, the conclusory claim that Plumley participated in the decision to keep King in segregation, taken as true, only shows that Plumley played a part in King's housing in administrative segregation that allegedly led to the surgery. However, segregated confinement is not a *per se* violation of the Eighth

9

Amendment.   See Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984); see also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 472 (4th Cir. 1999) ("[T]he isolation inherent in administrative segregation . . . is not itself constitutionally objectionable.").   Thus, allegations that Plumley participated in the decision to keep King segregated unless he consented to removal of the contraband marbles fails to state a claim since requiring King to choose between continued lawful confinement or valid consent to surgery to remove known contraband was permissible. See Wright, 766 F.2d at 850.   Moreover, although King generally claims that officials threatened him with physical violence, such a bare allegation without any factual enhancement does not nudge his claim that Plumley directly participated in violating his rights from conceivable to plausible as the complaint fails to allege what those actions were or connect Plumley to them.   See Twombly, 550 U.S. at 570.   Accordingly, the Court overrules this objection and finds that the complaint does not plead a plausible basis for holding Plumley liable under § 1983.

### C.    Dismissal of Eighth Amendment Claim

The R&R next recommends dismissing the Eighth Amendment claim.   King objects, arguing that the Defendants' threats to keep him in segregation unless he consented to the surgery violated his right to be free from cruel and unusual punishment.

"[T]o make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (citation and quotation marks

10

omitted).    "[T]he first showing requires the court to determine whether the deprivation of the basic human need was *objectively* 'sufficiently serious,' and the second requires it to determine whether *subjectively* 'the officials act[ed] with a sufficiently culpable state of mind.'"    Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).    To establish a serious deprivation, "evidence of a serious or significant physical or emotional injury resulting from the challenged conditions" must exist.    Id. at 1380.

As noted earlier, segregated confinement alone does not violate the Eighth Amendment.    See Allgood, 724 F.2d at 1101; see also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d at 472.    Moreover, the complaint fails to allege a plausible "serious or significant physical or emotional injury." See Strickler, 989 F.2d at 1379.    King alleges harm only resulting from the surgery, not from administrative segregation.    Accordingly, the Court overrules this objection because the complaint fails to state a plausible Eighth Amendment claim.

### D.    Denial of Motion as to Fourteenth Amendment Claim

Next, the R&R recommends allowing the equal protection claim to proceed.    The Defendants object, arguing that King has not adequately alleged unequal treatment and, even if he did, the policy applied to King survives rational basis review.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful

discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). If a plaintiff makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. (citations omitted).

Generally, courts analyze equal protection claims under rational basis review. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985) (citation omitted). Rational basis review provides that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Id. Indeed, a classification in such a statute has "a strong presumption of validity." Giarratano, 521 F.3d at 303. A heightened standard of review applies in cases involving the violation of a fundamental right or a suspect class, such as race or gender classifications. Id. Because King has not alleged that he is a member of a suspect class, rational basis review applies.

Even viewing the complaint liberally, King has not stated a plausible basis for finding the Defendants treated him differently from similarly situated individuals due to intentional discrimination. The complaint alleges that other inmates with penile implants or other modifications were not placed in segregation or told to remove the body modification. King fails to allege membership in a suspect class that sets him apart from these inmates or that the Defendants intentionally discriminated against him due to a particular suspect characteristic.

Even assuming for the sake of argument King sufficiently alleged intentional unequal treatment, King has not alleged sufficient facts to overcome rational basis review. King bears "the burden to negate every conceivable basis which might support" the

alleged differential treatment.  Id. (citation and quotation marks omitted).  The

Defendants have "no obligation to produce evidence to support the rationality of the

[classification], which may be based on rational speculation unsupported by any evidence

or empirical data."  Id. (citation and quotation marks omitted).  In this case, the

Defendants assert that their actions were rationally related to their interest in maintaining

facility security and public safety.  King's complaint attacks the Defendants' rationale only

through conclusory allegations: that "[t]here was absolutely 'NO' security interest" and

"NO penological interest" in removing the implants.  Such conclusory assertions are

insufficient to overcome the presumption of rationality.  See id. at 304 (finding

"conclusory assertion" that excluding inmates from protections of a federal statute was

"not rationally related to any legitimate government interest" was insufficient to state a

plausible equal protection claim).  Indeed, prison security is a legitimate state interest.

See, e.g., In re Long Term Admin. Segregration of Inmates Designated as Five

Percenters, 174 F.3d at 469 ("The rationale for judicial deference is greatest when the

maintenance of prison order is at stake."); Morrison, 239 F.3d at 655 ("[W]hile a prisoner

does not forfeit his constitutional right to equal protection by the fact he has been

convicted of a crime and imprisoned, prisoner claims under the equal protection clause .

. . must still be analyzed in light of the special security and management concerns in the

prison system.").  Placing King in segregation unless he had the implants removed

rationally furthered this interest as the presence of contraband in the general population

could threaten facility security and safety.  Accordingly, the Court sustains the

Defendants' objection and grants the motion to dismiss the Fourteenth Amendment claim.

### E.    Denial of Motion to Dismiss Fourth Amendment Claim

Finally, King claims that the surgery violated his Fourth Amendment right to be free from unreasonable searches and seizures.   The R&R recommends denying the motion to dismiss this claim.   The Defendants object to this recommendation.   They argue the Fourth Amendment does not apply because a prisoner does not have a reasonable expectation of privacy when contraband is implanted in his body and, even so, their interest in penological security outweighs any privacy interest of King.

The Fourth Amendment provides that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."   U.S. Const. amend. IV.   It applies only if "the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action."   Hudson v. Palmer, 468 U.S. 517, 525 (1984) (citation and quotation marks omitted).   In Hudson, the Supreme Court held that an inmate does not have a reasonable expectation of privacy in his prison cell given "the paramount interest in institutional security."   Id. at 527-28.   The Fourth Circuit has not squarely addressed whether inmates retain a right to privacy under the Fourth Amendment following Hudson. A majority of circuit courts have recognized that Hudson is limited to searches of prison cells and that prisoners retain an interest in their bodily privacy under Bell v. Wolfish, 441 U.S. 520 (1979), where the Supreme Court analyzed a challenge to body searches of prisoners under the Fourth Amendment.   Sanchez v. Pereira-Castillo, 590 F.3d 31, 42 & n.5 (1st Cir. 2009) ("We have recognized that a limited right of bodily privacy against searches is not incompatible with incarceration."); Thompson v. Souza, 111 F.3d 694,

14

699 (9th Cir. 1997) ("Notwithstanding the language in <u>Hudson</u>, our circuit has held that the Fourth Amendment right of people to be secure against unreasonable searches and seizures 'extends to incarcerated prisoners . . . .' (citation omitted)); <u>Canedy v. Boardman</u>, 16 F.3d 183, 185 (7th Cir. 1994); <u>Elliott v. Lynn</u>, 38 F.3d 188, 191 n.3 (5th Cir. 1994) (applying Fourth Amendment to visual body cavity searches in prison as <u>Hudson</u> "held only that prisoners have no justified expectation of privacy in their prison cells"); <u>Cornwell v. Dahlberg</u>, 963 F.2d 912, 916 (6th Cir. 1992) ("[T]his Circuit has joined others in recognizing that a convicted prisoner maintains some reasonable expectations of privacy while in prison . . . ."); <u>Covino v. Patrissi</u>, 967 F.2d 73, 78 (2d Cir. 1992) ("While we acknowledge the clear teaching of the Supreme Court's holding in <u>Hudson</u> with respect to prison spaces, we believe that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy."); <u>Dunn v. White</u>, 880 F.2d 1188, 1191 (10th Cir. 1989) (finding that, after <u>Hudson</u>, <u>Bell</u> preserves "[t]he prisoner's privacy interest in the integrity of his own person").  <u>But see Johnson v. Phelan</u>, 69 F.3d 144, 146 (7th Cir. 1995) (finding <u>Hudson</u> abrogated prisoners' Fourth Amendment right to privacy).  As nothing in <u>Hudson</u> indicates the Supreme Court intended to abrogate a prisoner's expectation of privacy beyond his cell, King had a legitimate expectation of privacy in his person.

The Court must now assess whether King pleaded a plausible basis for finding the surgery was an unreasonable, unconstitutional search.  <u>See Sanchez</u>, 590 F.3d at 44. This requires that the Court "balanc[e] . . . the need for the particular search against the invasion of personal rights that the search entails."  <u>Bell</u>, 441 U.S. at 559.  Specifically,

the Court must consider the search's full context and four factors: "1) the place in which the search was conducted; 2) the scope of the particular intrusion; 3) the manner in which the search was conducted; and 4) the justification for initiating the search." United States v. Edwards, 666 F.3d 877, 883 (4th Cir. 2011) (citing Bell, 441 U.S. at 559).

Further, Bell applies even though it involved a strip search. The Fourth Circuit explained in Edwards that Bell "developed a flexible test to determine the reasonableness of a broad range of sexually invasive searches, which included but was not limited to strip searches." Id. (quotation marks and citation omitted). Then, the Fourth Circuit applied Bell to a search where an officer used a knife to cut a sandwich baggie containing suspected narcotics from an individual's penis. Id. at 883-85. This case also involves a sexually invasive search because, like Edwards, the search concerned King's genitals.

Before applying the Bell factors, the Court reviews Sanchez v. Pereira-Castillo in which the First Circuit considered an inmate allegedly compelled to undergo surgery. In Sanchez, correctional officers used a metal detector when searching the plaintiff's living quarters, which gave a positive indication when scanning the plaintiff and four other inmates. 590 F.3d at 37. Law enforcement dogs, strip-searched, and re-scanned him with the metal detector while naked. Id. None of these measures found contraband. Id. Regardless, a prison official ordered a doctor to x-ray the plaintiff's abdomen. Id. The plaintiff objected to the x-ray. Id. After the x-ray, an officer ordered the plaintiff to have a bowel movement on the floor. Id. The plaintiff did so and did not expel a foreign object. Id. Then, another doctor informed the plaintiff that the x-ray showed a cell phone in his rectum. Id. The plaintiff requested another x-ray, but one was not done.

16

Id.  Instead, the plaintiff had a second bowel movement before correctional officers.  Id. This again did not produce any foreign objects.  Id.  Officials then transported the plaintiff to a medical facility where different doctors conducted two manual rectal examinations of the plaintiff.  Id.  Neither exam revealed a foreign object.  Id. Regardless, these doctors sent the plaintiff to consult with a surgeon.  Id. at 38.  The surgeon knew of the foregoing events and scheduled him for exploratory surgery.  Id. The surgeon obtained the plaintiff's written consent to the surgery.  Id.  The plaintiff alleged that he consented due to pressure from a John Doe and the surgeon's assurance that she would perform another rectal examination before the surgery.  Id.  Contrary to that assurance, the surgeon conducted only the surgery, which did not reveal any foreign objects.  Id.  Two days later, the plaintiff returned to prison.  Id.

After the surgery, the plaintiff filed suit under § 1983, alleging, among other things, that the rectal exams and surgery violated the Fourth Amendment.  Id. The district court granted the defendants' motion to dismiss the complaint.  Id. at 39-40.  On appeal, the First Circuit affirmed the dismissal of the claim as to the rectal exams but held the surgery was unreasonable.  Id. at 44, 47-48.

Considering the scope of the search, the First Circuit found that this was "[t]he most disturbing element of the exploratory surgery."  Id. at 44.  The First Circuit reached this conclusion in light of two Supreme Court decisions involving physical invasions beneath an individual's skin, Winston v. Lee, 470 U.S. 753 (1985) and Schmerber v. California, 384 U.S. 757 (1966).

In Winston, the Supreme Court held that a state could not force a criminal suspect

to undergo surgery to remove a bullet from his chest even though the bullet would help prosecute him. 470 U.S. at 755. The Court reasoned:

> The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers.

Id. at 760. The First Circuit deemed Winston applicable even though it did not concern an inmate because it involved the unique situation of compelled surgical invasion. Sanchez, 590 F.3d at 45.

After finding Winston pertinent, the First Circuit noted that Winston distinguished the compelled surgery from Schmerber where the Supreme Court had held that requiring a drunk driving suspect to undergo a blood test did not violate the Fourth Amendment. See Sanchez, F.3d at 45; Winston, 470 U.S. at 759-60. Schmerber assessed the reasonableness of the blood draw in light of three factors. See Winston, 470 U.S. at 761-62. First, the Court considered "the extent to which the procedure may threaten the safety or health of the individual." Id. at 761. This factor indicated the search was reasonable as the Court found that a blood test "involves virtually no risk, trauma, or pain" and "all reasonable medical procedures were taken and no unusual or untested procedures were employed." Id. Second, the Court assessed "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." Id. In doing so, the Court "recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity" by "noting that a blood test was . . . commonplace in these days of periodic physical

18

examinations." Id. at 762 (citation and quotation marks omitted). Finally, the Court weighed "the community's interest in fairly and accurately determining guilt or innocence" against the first two factors. Id. Weighing all of these factors, the Court upheld the blood test. Id. at 763.

After reviewing Winston and Schmerber, the First Circuit determined that the scope of the surgery was egregious since it "was not 'commonplace' and did involve 'risk, trauma, [and] pain.'" Sanchez, 590 F.3d at 45 (quoting Schmerber, 384 U.S. at 771). The First Circuit explained:

> Unlike a simple blood draw, plaintiff's surgery was unusual and required total anesthesia, surgical invasion of the abdominal cavity, and two days of recovery in the hospital. The complaint alleges that he was "slashed and mutilated" during the procedure, that his "life and health were jeopardized," and that he experienced "severe physical and emotional pain that continues at present."

Id.

Next, the First Circuit found no justification for the procedure because "[t]he surgery was conducted despite several indications of the absence of contraband." Id. at 45-46. Balancing these considerations, the First Circuit concluded that the complaint alleged an unreasonable search:

> Viewing the plaintiff's well-pleaded factual allegations as true, we conclude that "society is prepared to recognize" that a prisoner has a reasonable expectation that he will not be forced to undergo abdominal surgery for the purpose of finding contraband, at least in these circumstances. Hudson, 468 U.S. at 525, 104 S.Ct. 3194. Plaintiff was surgically invaded for the purpose of searching for a cell phone when other, less-invasive means had already indicated the absence of such an object. Unlike in Winston, there is serious doubt whether the surgery was even "likely to produce evidence of a crime," 470 U.S. at 759, 105 S.Ct. 1611, and by far less drastic measures the existence of the telephone could easily have been excluded. The surgery was a severe "intrusion upon [plaintiff's] dignitary interests in

> personal privacy and bodily integrity," <u>Winston</u>, 470 U.S. at 762, 105 S.Ct. 1611.

<u>Id.</u> at 47-48.

Turning to this case, the Court first considers the location where the search of King occurred. "The question whether a sexually invasive search is conducted in a private or a public setting is 'especially relevant' to" this factor. <u>Edwards</u>, 666 F.3d at 883 (<u>Polk v. Montgomery Cnty.</u>, 782 F.2d 1196, 1201-02 (4th Cir. 1986)). The complaint alleges the surgery took place in a private place, a hospital. Thus, this factor favors finding the surgery reasonable.

Second, the Court considers the manner in which the search was conducted. In <u>United States v. Edwards</u>, the Fourth Circuit stated that two factors supporting the reasonableness of the blood draw in <u>Schmerber</u> are relevant to this assessment: "that the procedure involved 'virtually no risk, trauma, or pain,' and did not raise any concerns regarding the suspect's 'fear' or 'health.'" <u>Id.</u> at 884-85 (quoting <u>Schmerber</u>, 384 U.S. at 771-72). Relatedly, <u>Edwards</u> stated that a search may be impermissible "if it is conducted in a cruel, painful, or dangerous manner" and that "contraband may not be seized in a manner that poses an unnecessary risk of harm to the person being searched." <u>Id.</u> at 885. Here, the complaint alleges that the surgery left King "scarred with . . . botched incisions," pain and tingling in his penis, and emotional anguish. In contrast to <u>Schmerber</u>, such allegations indicate the surgery posed a risk to King's health and caused him trauma and pain. Indeed, similar allegations in <u>Sanchez</u> favored finding that the surgery violated the Fourth Amendment. <u>See</u> 590 F.3d at 45. Thus, this factor favors finding the search unreasonable.

Third, the Court analyzes the scope of the search. Like Sanchez, surgery beneath the skin into a sensitive, private body part is not commonplace. It is not a routine procedure like the blood draw in Schmerber. However, while penile surgery may be unusual, King himself precipitated the surgery by electing the unusual insertion of marbles into his penis. Furthermore, unlike the Sanchez surgery, the location of King's surgery was not random, speculative or exploratory. The location was specific to the location of known contraband King chose to have inserted. No doubt, the original insertion probably caused discomfort similar to that of which he now complains. Furthermore, unlike Schmerber, the instant procedure was not merely to collect evidence of a possible offense. Rather, it was to remove known contraband. Therefore, this factor does not favor finding the surgery was unreasonable.

Finally, the Court considers the justification for the surgery. Prison officials have a legitimate interest in "locating and removing contraband from the prison system." Id. at 43 (citing Bell, 441 U.S. at 559). King admits the marbles were contraband. The Defendants discovered the marbles King implanted in his penis and informed him the marbles must be removed or he would remain in segregation. Therefore, this case differs from the mere exploratory surgery to search for possible presence of contraband in Sanchez because King admitted the presence of undisputed contraband in his body to the Defendants. Therefore, the Defendants' assessment that the marbles constituted contraband and threatened institutional security shows that the search was reasonable.

Weighing all of these factors and viewing the complaint in the light most favorable to King, the Court concludes that the surgery did not violate the Fourth Amendment.

21

King does allege a procedure that threatened his health and caused him trauma and pain. The surgery, however, occurred in a private setting and for the legitimate penological purpose of removing contraband from HCC. Further, the location of the procedure was caused by King's decision to place marbles in the area. Courts must take care "not to impose [their] own judgments about the security needs of prison administrators." Id. (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). That is particularly true here as, unlike Sanchez, King neither alleges nor is it readily apparent that a measure other than surgery could have removed the marbles. Accordingly, the Court sustains the Defendants' objection and grants the motion to dismiss this claim.

## IV. Conclusion

Upon careful review of the record, the Court **OVERRULES** the Plaintiff's Objections and **SUSTAINS** the Defendants' Objections. It is the opinion of this Court that the magistrate judge's Report and Recommendation should be, and is, hereby **REJECTED IN PART** for the reasons stated in this Order. Accordingly, the Court **GRANTS** the Defendants' Motion to Dismiss and **DISMISSES** the complaint **WITH PREJUDICE**.

This matter is **ORDERED STRICKEN** from the active docket of this Court.

The Court **DIRECTS** the Clerk to enter judgment in this matter.

The Clerk is directed to transmit copies of this Order to all counsel of record and the *pro se* Plaintiff.

**DATED:** February 26, 2015

GINA M. GROH
UNITED STATES DISTRICT JUDGE